1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | 1:11-cv-01251 GSA |
| ) | |
| Plaintiff, ) | **ORDER REGARDING CLAIMANT** |
| ) | **FELIX VELASCO'S MOTION FOR** |
| v. ) | **SUMMARY JUDGMENT** |
| ) | |
| APPROXIMATELY $77,000.00 IN U.S. ) | (Document 18) |
| CURRENCY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

16
17
18

## INTRODUCTION

19      Claimant FELIX VELASCO ("Claimant") seeks summary judgment on Plaintiff

20 UNITED STATES OF AMERICA's ("Plaintiff" or "Government") complaint for forfeiture *in*

21 *rem*.  More particularly, Claimant asserts the Government did not have probable cause to institute

22 this forfeiture action.  The Government contends that factual issues surrounding the forfeiture of

23 the defendant currency do not support summary judgment.[1]

24 //

25 //

26

27      [1] The parties have consented to the jurisdiction of the magistrate judge.  (Docs. 15 & 22.)

28                                                                  1

# RELEVANT PROCEDURAL BACKGROUND

On July 28, 2011, the Government filed its Verified Complaint for Forfeiture *In Rem* against approximately $77,000.00 in United States Currency.  (Doc. 1.)  In response, on August 15, 2011, Claimant filed both a verified claim opposing the forfeiture and an answer to the complaint, asserting, among others, an affirmative defense of innocent possessor or owner. (Docs. 7-8.)

On October 3, 2011, Claimant filed his Motion for Summary Judgment.  On November 11, 2011, the Government filed its opposition.  (Docs. 28-34.)  On November 28, 2011, Claimant filed his reply thereto.  (Doc. 35.)

Following the completion of briefing, the Court vacated the December 2, 2011, hearing on the motion and the matter was taken under submission pursuant to Local Rule 230(g).  For the reasons discussed below, this Court DENIES Claimant's motion for summary judgment.

# STATEMENT OF UNDISPUTED FACTS[2] [3]

1.  On January 25, 2011, Fresno County Sheriff's Office (FCSO) detectives initiated a traffic stop of a silver Chrysler 300 bearing California license plate number 5WGH562 on Interstate 5 near Highway 198 in the County of Fresno for a violation of California Vehicle Code § 22349 – Speeding, because the vehicle was traveling at 80 miles per hour in less than 1,000 feet of visibility.

2.  Mr. Velasco is the registered owner of the above referenced Chrysler 300.

3.  Upon stopping the Chrysler 300, a FCSO detective contacted the driver and sole occupant, Jorge Luis Delgado ("Delgado"), who identified himself with a Mexican driver's license.

4.  A FCSO detective who is fluent in Spanish spoke to Delgado, who spoke only Spanish, and advised Delgado that he was stopped because he was driving approximately 80 miles per hour in the fog. Delgado stated that he was going about 78 miles per hour. The detective advised Delgado that visibility was less than 1,000 feet as a result of the fog and that the speed limit on Interstate 5 is

---

[2] The Statement of Undisputed Facts is quoted directly from Claimant's points and authorities in support of the motion, found at pages three through eight; the internal citations have been omitted.  Although the Government disputes several facts, a careful review of the Government's arguments reveals they are directed toward Claimant's writing style rather than the actual facts in this case.

[3] This Court carefully reviewed and considered all evidence, arguments, points and authorities, declarations, testimony, statements of disputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to evidence, an argument, document, objection or paper is not to be construed that this Court did not consider the evidence, argument, document, objection or paper.

70 miles per hour.

5.  A FCSO detective asked Delgado from where he was coming and to where he was going. Delgado stated that he was going from Pittsburg to Bakersfield and when asked why he was taking the long way, Delgado stated that Highway 198 was less traffic.

6.  Delgado appeared nervous to the FCSO detectives and was allegedly shaking uncontrollably when he was handed back his license.

7.  A FCSO detective observed a single ignition key, air fresheners in a vent, and that the vehicle belonged to a third party (Mr. Velasco).

8.  When asked if there were any weapons, drugs, or large sums of currency in the vehicle, Delgado gave his consent for the detectives to search the vehicle.

9.  During a search of the vehicle, a FCSO detective located an air freshener in the trunk of the vehicle.

10.  Within the trunk, a detective removed the carpeting that covered the spare tire and observed a small piece of green plastic wrap, believed by the detective to be of the type commonly used to wrap narcotics and currency. The plastic fasteners located on the sides of the trunk interior that hold down the carpeting were then removed and it appeared that the fasteners had been removed before.

11.  When the carpet panel was removed, green plastic wrap was observed through a hole above the wheel well, and the plastic wrap contained defendant U.S. currency and was hidden in a natural void above the wheel well.

12.  The detectives removed the seven packages which constitute the now defendant currency from the void and observed that six of the packages were marked with "9.5" in black marker and one was marked with "21" also in black marker, and the currency located in the packages totaled approximately $77,000.00 in U.S. currency.

13.  The denominations in which the defendant currency was located are as follows: fifty-two $5 bills, one hundred ninety $10 bills, two thousand seven hundred thirty two $20 bills, seventy $50 bills, and one hundred sixty-seven $100 bills.

14.  When asked if the currency belonged to him, Delgado stated that the money was not his and he didn't know that it was in the vehicle. A detective showed Delgado a disclaimer and asset forfeiture form written in Spanish and explained the documents to Delgado. Delgado stated that he understood both forms, signed them indicating on the disclaimer of ownership form "No - se el dinero no es mio," (No, the money is not mine) and was provided with a copy of each form.

15. A detective photographed the Chrysler 300, the currency, and Delgado. Delgado and the vehicle were released after Delgado was given a written citation.

16.  Narcotic detecting canine "Cody" later gave a positive alert to the currency.

17.  According to the Employment Development Department (EDD), neither Delgado nor Mr. Velasco have reported wages since 2008.

18.  On or about April 29, 2011, Mr. Velasco filed an administrative forfeiture claim to the defendant currency stating, under penalty of perjury, that he is the owner of and has a possessory interest in, and the right to exercise dominion and control over the defendant currency, and that his claim is not frivolous.

19.  On June 17, 2011, Mr. Velasco's attorney sent a letter to the government's attorney, asking that the government return Mr. Velasco's seized, now defendant currency and representing that "Mr. Velasco is an 83-old World

3

War II veteran who has had a documented legitimate source of income for longer than I have been alive. He has no significant criminal history that I am aware of, and certainly no criminal drug history."

20.  On July 12, 2011, Mr. Velasco's attorney sent another letter to the government's attorney, again asking that the government return Mr. Velasco's seized, now defendant, currency and represented that:

> … any discovery in this case will disclose that Mr. Velasco has many legitimate and documented sources of income. He is 83 years old, has no criminal record, and had worked for over 40 years in a steel mill. In other words, Mr. Velasco is a bedrock solid all-American model citizen. I have determined that, for over 20 years, Mr. Velasco has also been receiving approximately $1,167 per month in social security retirement payments from the Federal Government and approximately $680 per month in pension/retirement payments from U.S. Steel/Carnegie Foundation as a result of his 40 years of employment. He also receives approximately $271 per month from Contra Costa County for Medi-Cal Payments. All of these income sources are easily proven with bank statements in my possession showing those direct deposits, which constitutes over $2,000 per month in income, more than enough to cover his modest expenses.
>
> I have also confirmed with the Wartnick Law Firm here in San Francisco that Mr. Velasco received $12,004.48 from an asbestos related legal settlement in January of this year, and I have a letter from the firm which substantiates this. Also, as I mentioned, I have invoices from the Contra Costa Times showing that Mr. Velasco placed regular advertisements therein, and the handwritten notes of Mr. Velasco reflecting customers that called in response to those ads, which confirms or at least tends to confirm that Mr. Velasco has operated a tree trimming and garbage hauling business for at least the last 8-9 years which has significantly supplemented his income. Additionally, I have documentation showing that Mr. Velasco has a Department of Veterans Affairs Insurance policy, which paid him out over $10,000 last year. All of this is on short order and not exhaustive of his sources of income over his long life.

21.  On July 13, 2011, the government's attorney e-mailed Mr. Velasco's attorney in response to the July 12 letter noting that no documents were provided with the letter and that "[i]f such documents exist, I am happy to consider and review whatever you provide to my office."

22.  On July 21, 2011, Mr. Velasco's attorney again sent a letter the government's attorney, requesting that the government decline to proceed with a judicial forfeiture proceeding, and providing the following documents and representing that the "documents [we]re not exhaustive of Mr. Velasco's legitimate sources of income over the course of his long life":

> 1. Discharge forms from the U.S. Army – showing that Mr. Velasco was born in 1928, served from 1946-1949 during which time he was educated and trained as a sheet metal worker, and that he was honorably discharged in August of 1949.
>
> 2. Bank statement – showing that Mr. Velasco receives monthly pension payments from United States Steel and monthly social security retirement payments from the federal government as

4

a result of his forty years of hard work as a sheet metal worker, and that his monthly expenses are modest.

    3. Print out of Service Advertisement Orders and Payments from the Contra Costa Times, along with handwritten notes of callers responding to those ads - showing that Mr. Velasco has a further source of income from his garbage hauling and tree trimming business.  Please note that, at different times, Mr. Velasco ran ads in the Penny Saver for this business.

    4. Letter, Distribution Statement, and Check from Wartnick Law Firm - showing that Mr. Velasco received over $12,000 from an asbestos settlement in January of this year.

23. On July 28, 2011, the government filed its Verified Complaint for Forfeiture In Rem.

24. Mr. Velasco was 83 years old and had no criminal history on July 28, 2011.

## LEGAL STANDARDS

Rule 56(a) of the Federal Rules of Civil Procedure permits a party to move for summary judgment on all or part of a claim.  Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

In a motion for summary judgment, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp., v. Catrett*, 477 U.S. 317, 323 (1986).

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or

show that the nonmoving party does not have enough evidence of an essential element to carry its

ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,

210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance*

*Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the

motion, the moving party must persuade the court that there is no genuine issue of material fact."

*Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the

substantive law will identify which facts are material.  Only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

"If a moving party fails to carry its initial burden of production, the nonmoving party has

no obligation to produce anything, even if the nonmoving party would have the ultimate burden

of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 160, 90 S.Ct. 1598 (1970).  "If, however, a moving party carries its burden of

production, the nonmoving party must produce evidence to support its claim or defense." *Nissan*

*Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to

produce enough evidence to create a genuine issue of material fact, the moving party wins the

motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*,

477 at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make the showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial").

"But if the nonmoving party produces enough evidence to create a genuine issue of

material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see*

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine

issue of material fact is enough 'to require a jury or judge to resolve the parties' differing

versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983)

(quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. Fed. R. Civ. P. 56(c); *Covey Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. at 157; *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

This case is governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"). Prior to CAFRA's passage, the Government had "the initial burden of establishing probable cause connecting seized property with illegal drug transactions." The burden then shifted to claimants to prove, by a preponderance of the evidence, that the money was not connected with illegal drug activity. *See United States v. $42,500 in U.S. Currency*, 283 F.3d 977, 980 (9th Cir. 2002). Congress passed CAFRA to "transfer[] the burden of proof to the government and required[] the government to establish forfeiture by a preponderance of the evidence rather than by the [former] lower probable cause standard." *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). When the "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). The

burden then shifts to the claimant to prove by a preponderance of the evidence that the claimant is an innocent owner of the property.  18 U.S.C. § 983(d).  The determination of whether the Government has met its burden of proof is based on the aggregate of facts, including circumstantial facts.  *United States v. $42,500 in U.S. Currency*, 283 F.3d at 980; *see also United States v. $30,060 in U.S. Currency*, 39 F.3d 1039, 1041 (9th Cir. 1994).

In interpreting CAFRA, the Ninth Circuit retained the section 1615 probable cause pleading requirement.  *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) ("We hold that section 1615 continues to require that the government show probable cause to institute a forfeiture action").

In a civil forfeiture proceeding under Title 21 of the United States Code section 881(a)(6), seized money is subject to forfeiture if it was: "(1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws."  *United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1071 (9th Cir. 1994).  The Government must show that it had reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof.  *United States v. $30,060 in U.S. Currency*, 39 F.3d at 1041.  "Each case stands upon its own facts, and the presence or absence of any one fact is not dispositive; indeed probable cause is not an exacting standard."  *United States v. $42,500 in U.S. Currency*, 293 F.3d at 980, citation omitted.  "Probable cause to believe that the property is involved in *some* illegal activity is not enough - the government must have probable cause to believe that the property is involved in the activity subjected to the specific forfeiture statute it invokes."  *United States v. $191,910 in U.S. Currency*, 16 F.3d at 1071.

## DISCUSSION

In opposition to Claimant's motion, the Government contends the totality of circumstances here establish the propriety of forfeiture.  More particularly, the Government

points to approximately twenty-five "aggregate facts" it contends establish a substantial

connection between the currency and an illegal drug transaction:

a) 3rd party vehicle ownership;
b) indirect route of travel;
c) illogical explanation;
d) single ignition key with no other keys on key ring;
e) air freshener in cabin of vehicle;
f) no luggage or other indicia of travel;
g) air freshener in empty trunk;
h) continued high level of extreme nervousness throughout traffic contact despite being informed only a warning would be issued;
i) uncontrollable shaking of hands;
k) concealment of large quantity of cash in natural void of wheel well;
l) large quantity of cash;
m) large quantity of cash wrapped in green plastic wrap-commonly utilized by drug traffickers;
n) currency bundled with rubber-bands;
o) no bank wrappers found;
p) bundles of currency wrapped in tape;
q) bundles of currency marked with "9.5" and "21";
r) make-up of denominations-i.e. 2,732 twenty-dollar bills;
s) unusual body language and refusal to watch search;
t) positive alert by trained and certified drug-detecting canine Cody;
u) no verifiable employment information or wages from at least 2008;
v) in light of presumed monthly income and presumed monthly expenses, no legitimate source for such large quantity of cash;
w) lack of evidence demonstrating withdrawal from bank of defendant currency;
x) highly trained and certified drug-detecting canine Cody does not alert on circulated currency;
y) highly trained and certified drug-detecting canine Cody has not given a false positive in 2010 or 2011.

(Doc. 28 at 16-17.)

### The Facts Pertaining to Driver Delgado

Initially, the Court notes that the Government seeks to impute the various characteristics

attributed to the driver of the vehicle - Jorge Luis Delgado - to Claimant Felix Velasco.  Claimant

is the owner of the vehicle but was not present when Delgado was stopped.

However, the Government has not identified any legal authority within this circuit

wherein the various "aggregate facts" relative to the driver of the vehicle at the time of the stop

are attributed to the claimant of the defendant currency where the driver and the claimant are *not*

one in the same.  In fact, a review of the authorities presented by the Government indicates that in each case referenced in its opposition, the claimant and the individual stopped were one in the same:  *United States v. $129,727 in U.S. Currency*, 129 F.3d 486 (9th Cir. 1997) (Trujillo was airline passenger carrying currency and the claimant); *United States v. $242,484 in U.S. Currency*, 389 F.3d 1149 (11th Cir. 2004) (Stanford was airline passenger carrying currency and the claimant); *United States v. $124,700 in U.S. Currency*, 458 F.3d 822 (8th Cir. 2006) (Gonzolez was driver of rental car and one of three claimants [other claimants testified that they provided cash to Gonzolez]); *United States v. $141,770*, 157 F.3d 600 (8th Cir. 1998) (Moreno-Pena was driver and claimant); *United States v. $107,840 in U.S. Currency*, 784 F.Supp.2d 1109 (S.D. Iowa Apr. 29, 2011) (Pusey was driver of rental truck and claimant); *United States v. $21,055 in U.S. Currency*, 778 F.Supp.2d 1099 (D. Kan. Mar. 31, 2011) (Vennemann was driver of truck and claimant); *United States v. $50,720 in U.S. Currency*, 589 F.Supp.2d 582 (E.D.N.C. July 26, 2008) (Roberts was driver and claimant); *United States v. $433,980 in U.S. Currency*, 473 F.Supp.2d 685 (E.D.N.C. Jan. 17, 2007) (Rodriguez was driver and claimant); *United States v. $9,135 in U.S. Currency*, 1998 WL 329270 (E.D. La. June 18, 1998) (Davis was airline passenger and claimant); *see also  United States v. $493,850 in U.S. Currency*, 518 F.3d 1159 (9th Cir. 2008) (Camacho & Bruno were driver and passenger in truck and claimants); *United States v. $42,500 in U.S. Currency*, 283 F.3d 977 (Hysell was airline passenger and claimant); *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212 (9th Cir. 2001) (Malone was airline passenger and claimant); *United States v. $49,576 in U.S. Currency*, 116 F.3d 425 (9th Cir. 1997) (Lombera was airline passenger and claimant).

None of the cases cited involve a situation such as the one before the Court, where the driver of the vehicle is *not* a claimant to the currency.  Therefore, this Court finds that those facts identified by the Government at pages 16 and 17 of its opposition as "a" through "d," "f," "h" through "j," and "s" should not be considered as weighing against Claimant here because they relate only to the driver of the vehicle rather than the Claimant.

1    ***The Dog Sniff***

2       In opposition to Claimant's motion, the Government relies in part on the fact that canine

3    Cody alerted to the defendant currency.

4       Here, Detective Ramiro Rodriguez's declaration references the fact that canine Cody was

5    trained to "search for narcotic odor . . . and alert to narcotic odor."  More specifically, the dog

6    can detect marijuana, heroin, cocaine, methamphetamine, and opium.  (Doc. 32, ¶ 6.)  Rodriguez

7    further declares the certification process Cody completed involves "(1) whether the canine

8    recognizes the odors of marijuana, cocaine, heroin, methamphetamine and opium; (2) whether

9    the canine responds to those odors; and (3) whether the handler recognizes the canine's

10   responses.  As part of this process, the canine is also tested or 'proofed' against non-narcotic

11   items . . . such as food, plastics, cotton, *currency*, etc."  (Doc. 32, ¶ 8, emphasis added.)

12   Significant here, Rodriguez declares that in weekly training he "proof[s] Cody using currency,

13   both uncirculated currency obtained from the United States Mint, as well as circulated currency,

14   to test whether he alerts to the odor of currency or to any alleged trace odors of narcotics on

15   currency.  He does not."  (Doc. 32, ¶ 14.)  With specific regard to the defendant currency in this

16   case, Cody "alerted on a specific shrub [where the currency had been placed], detecting the odor

17   of illegal drugs . . .."  (Doc. 32, ¶ 25.)

18      The Ninth Circuit has given probative weight to positive alerts by "sophisticated" dogs -

19   dogs that react only to ephemeral by-product of narcotics and not to commonly circulated

20   currency - to show that currency is substantially connected to illegal drug activity.  *See United*

21   *States v. $42,500 in U.S. Currency*, 283 F.3d at 982; *United States v. $22,474 in U.S. Currency*,

22   246 F.3d at 1216.

23      More specifically, the Ninth Circuit has explained its jurisprudence on unsophisticated

24   versus sophisticated dog alerts to currency:

25          In addition, Sutter alerted to the money found in Hysell's luggage. Sutter's
            handler submitted a declaration stating that Sutter does not alert to cocaine residue
26          found on currency in general circulation. Rather, Sutter alerts to a by-product of
            cocaine which does not linger on currency. We recently held that a sophisticated

27

28                                              11

dog alert, where the dog reacts only to ephemeral by-products of narcotics and not to commonly circulated currency, is an important factor in determining probable cause. *See United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir.2001) (explaining that because of more sophisticated training a narcotics canine would not alert to money unless it had recently been in the proximity of cocaine). The evidence of Sutter's sophisticated training is undisputed, and therefore, Sutter's alert is relevant in determining probable cause.

Hysell relies on *U.S. Currency, $30,060* to diminish the probative value of Sutter's alert. 39 F.3d at 1041-44. In that case we discounted an alert by a trained dog when presented with uncontroverted evidence that seventy-five percent of circulated money in Los Angeles was contaminated by residues from controlled substances. *Id.* More recently, however, we reaffirmed the importance of alerts from drug dogs trained to detect transient by-products from narcotics, indicating recent contact with drugs. *$22,474 in U.S. Currency*, 246 F.3d at 1216. As Sutter has been trained in such a manner, we reject Hysell's reliance on *U.S. Currency, $30,060.*

Hysell also relies on *United States v. $49,576 U.S. Currency*, 116 F.3d 425 (9th Cir.1997) to support her argument that the government failed to establish probable cause. In that case, we reversed the district court's finding of probable cause because there was no link between the seized money and illegal drug activities. The claimant in that case fit a drug courier profile, gave dishonest answers when questioned, walked in a nervous manner, had inconsistent identifications, and did not have the key to unlock his luggage. Officers discovered a large amount of money wrapped in jeans in the luggage, a drug dog alerted to the money, and the claimant denied ownership of the money at the time of the search. He had also been detained in the past for a drug related crime but was never charged. The government relied heavily upon the dog alert and the prior detention for a drug related crime to establish probable cause. We discounted the dog alert based on *U.S. Currency, $30,060*, and gave no weight to the detention because the claimant had never been charged with the crime.

While some of the facts in *$49,576 U.S. Currency* are similar to the present case, our treatment of drug dog alerts has become more discriminating since we decided that case, and key factors differ. In this case, Sutter's alert is afforded greater weight due to the undisputed evidence that Sutter had sophisticated training and would not alert to generally circulated currency. *See $22,474 in U.S. Currency*, 246 F.3d at 1216. In addition, the packaging of the money differs. The wrapping of cash in cellophane, as compared to blue jeans, has materially different implications. As noted earlier, cellophane is highly impermeable to gas and commonly used to stave off detection by trained drug dogs; blue jeans could not possibly have the same effect.

*United States v. $42,500 in U.S. Currency*, 283 F.3d at 982-983.  Here, Claimant relies on the two cases relied upon by claimant Hysell in the aforementioned excerpt.  As explained above however, where a canine is trained not to alert to currency in general circulation, but instead the canine alerts only to the by product of illegal narcotics, that evidence is to be afforded greater weight in a determination of this kind.

12

1    It thus appears that Cody's training lends itself to a finding that Cody is in fact a

2    "sophisticated" dog.  Therefore, Cody's alert to the presence of illegal drugs on the currency

3    found in Claimant's vehicle is strong evidence going to the determination of whether the

4    Government had met its burden.

5         ***Large Amount of Currency***[4]

6         Claimant's vehicle contained a substantial sum of money.  The Ninth Circuit has

7    observed that a large amount of money alone may be "strong evidence that the money was

8    furnished or intended to be furnished in return for drugs."  *United States v. $29,959.00 in U.S.*

9    *Currency*, 931 F.2d 549, 553 (9th Cir. 1991) (finding cash amounting to $29,959.99 is an

10   "extremely large amount" to be kept in the home); *see also United States v. $83,310.78 in U.S.*

11   *Currency*, 851 F.2d 1231, 1236 (9th Cir. 1988) (carrying a large sum of cash is "strong evidence"

12   of a connection to illegal drug activity).

13        The Court notes that the cases relied upon by the Government in support of its position

14   are factually distinguishable.  For example, in *United States v. $29,959.00 in U.S. Currency*, 931

15   F.2d 549, the amount of cash was found along with drugs and drugs paraphernalia on property

16   owned by claimants; in *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, the

17   claimant offered no documentation to explain the source of the currency coupled with several

18   inconsistent statements; and in *United States v. $84,615 in U.S. Currency*, 379 F.3d 496 (8th Cir.

19   2004), the driver/claimant possessed drugs at the time of the stop and claimed the money was his

20   life savings, money from his uncle, and money from the closure of a gem and mineral business -

21   explanations found not credible.

22

23   _____

24        [4]With regard to the Government's assertion that a lack of receipt for the withdrawal of cash has been found
     to prove a substantial connection to drug activity, citing to *United States v. $86,020 in U.S. Currency*, 1 F.Supp.2d

25   1024 (D. Ariz. Nov. 12, 1997), the Court notes the case cited is factually distinguishable.  There, the
     claimant/passenger offered three different stories regarding the source of the money after claiming to have withdrawn

26   $48,000 of the total sum from a number of banks.  Here, there is no claim by Velasco that he withdrew the money
     from any bank nor were there a number of different stories offered for its source.

27

28                                          13

1    Here, neither drugs nor drug paraphernalia were found, nor were inconsistent statements

2    offered.  In fact, as is discussed more fully below, there is documentation regarding legitimate

3    sources of the defendant currency.  Nevertheless, the fact remains that $77,000 is a large sum of

4    money to be stored in the trunk of a vehicle.  *United States v. $29,959.00 in U.S. Currency*, 931

5    F.2d at 553.

6    In the totality of circumstances, the large sum of money at issue here is "strong evidence

7    that the money was furnished or intended to be furnished in return for drugs."  *United States v.*

8    *$93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir. 1984).

9    ***Packaging or Bundling and Concealing of Currency***

10    In this circuit, it has been noted that "cellophane is not a normal repository for carrying

11    large amounts of money.  Rather, cellophane, which is largely impermeable to gas, is commonly

12    used to conceal the smell of drugs and avoid detection by drug dogs."  *United States v. $42,500*

13    *in U.S. Currency*, 283 F.3d at 982, citing to *United States v. $129,727 in U.S. Currency*, 129 F.3d

14    at 490.  Here, the currency was wrapped in "green plastic wrap" and "was hidden in a natural

15    void above the wheel well."  (Doc. 19 at 3, ¶¶ 10-11.)[5]  Bundles of cash in various denominations

16    wrapped in rubber bands has been found to be "indicative of a drug organization bundling

17    money."  *United States v. $242,484.00 in U.S. Currency*, 389 F.3d 1149, 1161-62 (11th Cir.

18    2004).

19    More specifically, the defendant currency had been bundled in rubber bands, then

20    wrapped in green plastic wrap and blue tape.  Six of the seven packages were labeled "9.5" and

21

22

23    _____

24    [5]The Government cites to *United States v. Wojcik*, 60 F.3d 431 (8th Cir. 1995), as well as *United States v.*
*$4,629 in U.S. Currency*, 359 F.Supp.2d 504 (V.D. Va. Feb. 22, 2005), for the proposition that "[t]he discovery of
marked money has been found significant evidence that the seized currency is traceable to a drug transaction."  (*See*

25    Doc. 28 at 18.)  However, the Court is curious about the Government's citation as the "marked money" in *Wojcik*
refers to the money the Government's undercover officer used to purchase crack cocaine from the defendant; a

26    completely different form of "marked money" than the form with which this case is concerned.  *See Wojcik*, 60 F.3d
at 434 ("and marked money from undercover drug deals was intermingled in the $30,577 [seized]"); *see also $4,629*

27    *in U.S. Currency*, 359 F.Supp.2d at 509 (same).

28                                              14

1  one package was labeled "21," containing $9,500 each and $21,000 respectively.  In total,

2  according to the parties, the purported $77,000 consisted of the following denominations:

| Value of Bill | Total Number of Bills |
|---|---|
| $   5.00 | 52 |
| $ 10.00 | 190 |
| $ 20.00 | 2,732 |
| $ 50.00 | 70 |
| $100.00 | 167[6] |

9  (*See* Doc. 1, ¶ 6; Doc. 19, ¶ 13.)

10  By the Court's calculations, the amount of currency located in the trunk of Claimant's car

11  was either $77,000 or $78,000.[7]  Regardless of the correct figure however, this Court finds that

12  the manner in which the currency was bundled, wrapped and concealed does weigh in favor of a

13  finding that the currency is substantially connected to an illegal drug transaction.

14  ***Presence of Air Fresheners***

15  Next, the Government points to an air freshener or fresheners in the cabin of the vehicle

16  and an air freshener in the "empty trunk" as factors establishing a substantial connection between

17  the currency and an illegal offense.  More particularly, Detective Israel Rubalcava's declaration

18  states that he "noticed . . . air fresheners in a vent on the dash."  (Doc. 31, ¶ 19; *see also* Doc. 29,

19  ¶ 17.)  Detective Jensen searched the trunk and "noticed that there was an air freshener in the

20  trunk . . . an unusual place for an air freshener . . .."  (Doc. 29, ¶ 20; *see also* Doc. 31, ¶21.)  And,

21  Special Agent Ramirez's declaration references the "presence of air freshener" in the cabin and

22  trunk.  (Doc. 30, ¶ 7.)

23

24  [6]The declarations of Jensen and Rubalcava indicated "127" $100 bills were seized, rather than 167.  The

25  Court assumes these inconsistencies are typographical errors.  (*See* Doc. 29, ¶ 29 & Doc. 31, ¶ 28.)

26  [7]Totaling the seven bundles: 6 x 9500 = 57000; 57000 + 21000 = $78,000.  Or, totaling all denominations

27  referred to: 5 x 52 = 260, 10 x 190 = 1900, 20 x 2732 = 54640, 50 x 70 = 3500, 100 x 167 = 16700; for a grand total of $77,000.

28

In *United States v. $493,850 in U.S. Currency*, 518 F.3d 1159, during a traffic stop, as the officer approached the vehicle, he "could smell the strong odor of air freshener," a technique employed in masking the odor of narcotics. Here, there is no evidence of a "strong odor" of air freshener. None of the declarations provided assert anything other than the mere presence of one or perhaps two air fresheners in the cabin of the vehicle and a single air freshener in the trunk of the vehicle. In the absence of a strong odor, rather than the mere presence of air fresheners, an air freshener may be employed to do just that: freshener the air. The mere presence of an air freshener, or even two, is not particularly suspicious. Moreover, while it may in fact be unusual to place an air freshener in the trunk of a vehicle, this factor amounts to nothing more than mere suspicion. Accordingly, this Court finds little probative value in the presence air fresheners in the Claimant's vehicle at the time it was stopped.

### A Substantial Connection Has Been Established

Considering the aggregate of facts - namely the canine alert or sophisticated dog sniff, the large amount of currency, and the manner in which the currency was both packaged and bundled - the Government has met its burden of proof and established that there is a substantial connection between the defendant currency and an illegal drug transaction. Thus, the burden shifts to the claimant to prove he is an innocent owner of the property, or that there exists a legitimate source for the money.

### Innocent Ownership and Legitimate Source Issues

Because the Government has presented factors pertaining to the seizure of the currency establishing a substantial connection to an illegal drug transaction, Claimant must prove innocent ownership. Claimant must prove he "(1) did not know of the conduct giving rise to forfeiture; or (2) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." *United States v. $493,850.00 in U.S. Currency*, 518 F.3d at 1170. Claimant has the burden to "prove the money had an independent source and had not been used illegally." *United States v. $22,474.00 in U.S.*

1   *Currency*, 246 F.3d at 1217, citing *United States v. $215,300.00 in U.S. Currency*, 882 F.2d 417,

2   420 (9th Cir. 1989).

3       Claimant's declarations are silent as to any knowledge of the conduct giving rise to the

4   forfeiture, nor does he assert that upon learning of the conduct he terminated such use of the

5   property.  In no way does Claimant address Delgado's use of his vehicle.  (Docs. 19-2 & 35-1.)

6   However, Claimant does offer evidence to establish an independent source for the currency at

7   issue here.

8                    **Legitimate Source**

9       Claimant declares that he is eighty-three years old and has never been convicted of a

10  crime.[8]  Following service in the United States Army, Claimant worked for approximately forty

11  years in the steel industry.  Claimant receives retirement benefits, as well as Social Security and

12  Medi-Cal benefits, totaling approximately $2,118.00 per month.  Moreover, since retiring in

13  1989, Claimant has maintained a largely cash business, providing tree trimming and garbage

14  hauling services in Northern California.  He claims usual monthly expenses of approximately

15  $1,200 to $1,400 per month.  (*See* Docs. 19-2 & 35-1.)

16      While the Government asserts there is "no legitimate source for such [a] large quantity of

17  cash," that assertion is simply incorrect.  In fact, using only the verifiable income reflected above

18  - the retirement benefits Claimant has received for approximately twenty years - this Court

19  calculated, for example, that saving fifteen percent of that sum every month would result in an

20  overall savings of $76,320.00.[9]  Moreover, the Government's argument that the California

21  Employment Development Department records provide "no verifiable employment information

22  or wages from at least 2008" misses the mark where Claimant has been retired since 1989, and

23

24  ───────────────

25      [8]Evidence of a prior drug conviction is probative of probable cause.  *United States v. $83,310.78 in U.S.
    Currency*, 851 F.2d at 1236 (prior conviction for cocaine trafficking); *but see United States v. $49,576 in U.S.

26  Currency*, 116 F.3d at 427 (dismissed charge [no criminal history] not probative).

27      [9]$2,120 x 12 months = $25,440.  $25,440 x 20 years = $508,800.  15% of $508,800 = $76,320.

28                                    17

1    operates a small business for which services are "frequently, if not usually, paid in cash." (Doc.

2    35-1, ¶ 7.)

3        Finally, Claimant is or was a party to litigation involving asbestos exposure in the

4    workplace. On January 12, 2011,[10] a check in the sum of $12,004.48 was distributed to Claimant

5    in this regard. Over the last fifteen years, Plaintiff estimates he has received between $100,000

6    to $120,000 in total settlement proceeds relating to the injuries he sustained as a result of the

7    asbestos exposure. (Doc. 35-1, ¶ 8.)

8        It is mere speculation to conclude that a retired person receiving monthly benefits that are

9    supplemented by the proceeds of a primarily cash-based service business, whom also has

10   received significant settlement proceeds from ongoing litigation to which he is a party, does not

11   have a legitimate source for the quantity of currency at issue here.

12       Nonetheless, this Court notes a complete lack of explanation by Claimant regarding the

13   presence of the currency in the trunk of his vehicle. In other words, he has offered no reason for

14   keeping a large amount of money in his trunk, such as, for example, a distrust of banking

15   institutions. It is thus somewhat significant to note that Claimant maintains a bank account with

16   Bank of America and relies upon evidence related thereto in order to establish a legitimate source

17   for the defendant currency. Moreover, Claimant has failed to explain or address the fact the

18   currency was wrapped in green plastic wrap or cellophane - a substance "commonly used to

19   conceal the smell of drugs and avoid detection by drug dogs." *United States v. $42,500 in U.S.*

20   *Currency*, 283 F.3d at 982. Therefore, while Claimant may be able to account for the fact he

21   could have amassed a large amount of cash given his pension, cash-based small business, and

22   asbestos litigation settlement funds, his failure to address or explain the use of his vehicle's trunk

23   as a bank, or explain the needs to store that money wrapped in cellophane, cannot overcome the

24   evidence proffered by the Government in the form of a sophisticated dog sniff, large sum of

25   money, and the packing and bundling of that money.

26   _____

27       [10]The incident giving rise to this action occurred on January 25, 2011.

28                                    18

**CONCLUSION AND ORDER**

In sum, the Government has met its burden by establishing that the defendant currency at issue here is substantially connected to an illegal drug transaction.  The burden then shifted to Claimant to establish, by a preponderance of the evidence, that he is an innocent owner.  This is a burden that Claimant could not meet on summary judgment.  Thus, there exist genuine issues of material dispute and summary judgment is inappropriate.

In accordance with the foregoing, Claimant Felix Velasco's motion for summary judgment is DENIED.


IT IS SO ORDERED.

**Dated:   April 10, 2012      _____ /s/ Gary S. Austin_____**
                                        UNITED STATES MAGISTRATE JUDGE

19